IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: TEXTAINER PARTNERSHIP SECURITIES LITIGATION _____ THIS DOCUMENT RELATES TO: ALL ACTIONS _____/ | No. C-05-0969 MMC **ORDER GRANTING TEXTAINER DEFENDANTS' MOTION TO DISMISS; VACATING HEARING** (Docket No. 194) |

Before the Court is the Textainer Defendants'[1] motion, filed September 14, 2006, to dismiss the claims asserted against them in lead plaintiff Stephen L. Craig's Fourth Amended and Consolidated Class Action Complaint ("4AC" or "Fourth Amended Complaint"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and for failure to meet the heightened pleading standard of the Private Securities Litigation Reform Act ("PSLRA"). Plaintiff has filed opposition to the motion; the Textainer Defendants have filed a reply. Having considered the papers submitted in support of and in opposition to the motions, the Court finds the matters appropriate for decision without oral argument, see Civil L.R. 7-1(b), VACATES the January 12, 2007 hearing, and rules as follows.

---

[1] The Textainer Defendants are Textainer Equipment Management, Ltd. ("Textainer Equipment"), Textainer Financial Services Corporation ("Textainer Financial"), Textainer Capital Corporation ("Textainer Capital"), Textainer Limited ("Textainer Ltd."), Textainer Group Holdings, Ltd. ("Textainer Holdings"), and John A. Maccarone ("Maccarone").

**BACKGROUND**

The instant action is a purported class action arising from the sale of the assets ("Asset Sale") of TCC Equipment Income Fund, L.P. ("Textainer I"), TCC Equipment Income Fund II, L.P. ("Textainer II"), TCC Equipment Income Fund III, L.P. ("Textainer III"), TCC Equipment Income Fund IV, L.P. ("Textainer IV"), TCC Equipment Income Fund V, L.P. ("Textainer V"), and TCC Equipment Income Fund VI, L.P. ("Textainer VI") (collectively "Textainer Partnerships") to defendant RFH, Ltd. ("RFH").  The following background section is taken from the allegations of the Fourth Amended Complaint.

Each Textainer Partnership owned a fleet of shipping containers, which they leased to customers; the shipping containers and the leases thereof were the primary assets of the Textainer Partnerships.  (See 4AC ¶¶ 1, 11, 25-27.)  Textainer Equipment was an associate general partner of the Textainer Partnerships and was responsible for management of the Textainer Partnerships' leasing operations.  (See id. ¶ 12.)

Textainer Financial was a general partner of the Textainer Partnerships and was responsible for overall management of the business of the Textainer Partnerships.  (See id. ¶ 13.)  Textainer Capital owns Textainer Financial and has identified itself, in correspondence to the limited partners, as the managing general partner of the Textainer Partnerships.  (See id. ¶ 14.)  Textainer Ltd. is an associate general partner of the Textainer Partnerships.  (See id. ¶ 15.)  Textainer Holdings owns Textainer Equipment, Textainer Financial, Textainer Capital, and Textainer Ltd.  (See id. ¶ 16.)  Maccarone is president, chief executive officer, and a director of Textainer Holdings, Textainer Financial, Textainer Capital, and Textainer Ltd., as well as a director of Textainer Equipment.  (See id. ¶ 17.)

Textainer Holdings created an Investment Advisory Committee ("IAC") to advise the general partners with respect to the operation and financial condition of the Textainer Partnerships.  (See id. ¶ 29.)   In May 2004, the IAC decided to seek bids for the assets of the Textainer Partnerships, and sent out information packets to eight potential bidders.  (See id. ¶ 32.)  Bids were subject to the condition that the purchaser agree to accept a

management contract with Textainer Equipment ("management contract requirement"). (See id.) Plaintiff alleges the management contract requirement eliminated any potential bidder who did not want or need Textainer Equipment to manage the assets, and had the effect of limiting the price that potential bidders were willing to pay for the assets. (See id.)

The highest bid was a joint bid submitted in June 2004 by two entities, Hakman Capital Corporation ("Hakman") and Fortis Bank (Nederland) N.V. ("Fortis Bank"), which subsequently were joined by a third entity, P&R Equipment and Finance Corporation ("P&R"), to form defendant RFH. (See id. ¶¶ 19, 35, 37.) "The price RFH agreed to pay was effective as of July 1, 2004 and was adjusted downwards as of January 1, 2005 purportedly because of a reduction in the number of containers owned by the Partnerships and the value of each container to be purchased by type and year of manufacture." (See id. ¶ 35.) On November 30, 2004, each of the Textainer Partnerships entered into an asset sale agreement with RFH, subject to approval by the "affirmative vote of more than 50% of the limited partnership units in each of the Partnerships." (See id. ¶ 75.)

To secure the approval of the limited partners, the Textainer Defendants disseminated proxy statements, which were substantially identical, to the limited partners of each of the six partnerships. (See id. ¶ 76.) Included with the proxy statements was a cover letter, dated January 21, 2005, written by Maccarone ("Maccarone letter"), which stated that the general partners believed the Asset Sale was "fair to and in the best interests of the limited partners." (See id. ¶ 80.) On March 21, 2005, the limited partners of each of the Textainer Partnerships voted to approve the Asset Sale, which was completed on April 18, 2005. (See id. ¶ 109.)

Plaintiff contends the proxy statements were materially false and misleading because (1) they failed to disclose that, between the date the Textainer Defendants and RFH agreed on a price for the Asset Sale and the date of the proxy statements, the price of shipping containers had increased by approximately 18-20%, and (2) they failed to disclose that the assets were "being sold at less than the highest price" by reason of the management contract requirement. (See id. ¶ 79.) Plaintiff alleges the Maccarone letter

3

was materially false and misleading because the assertedly "fair" deal actually was at a price below prevailing market values and not in the best interests of the limited partners. (See id. ¶ 81.)

Plaintiff further alleges, for the first time, that the Proxy Statements "failed to mention that the right to manage a fleet has significant value,[2] and that because bidders were forced to accept the management contract requirement, they would have discounted their bids to account for the management requirement. (See id. ¶ 6.) Also for the first time, plaintiff alleges that the Proxy Statements were false or misleading because they failed to disclose the existence of a five-year contract, entered into in June 2003, between "Textainer"[3] and the United States Army ("military contract"), by which Textainer agreed to supply the military with an "open-ended number of containers" on short notice. (See id. ¶¶ 86-91.) According to plaintiff, the management contract requirement enabled Textainer to ensure that it would have a ready source of containers to supply to the military, but the use of the Textainer Partnerships' fleet to satisfy the military contract was not beneficial to a non-Textainer-related purchaser thereof. (See id. ¶ 89.) Plaintiff alleges that although Textainer "would benefit from the arrangement because it was reaping the benefits of the military contract even if the use of the Partnerships' containers could have been more lucrative elsewhere, a third party would not realize such benefit," but "would be foregoing a more cost-effective use of the containers." (See id. ¶ 90.) Accordingly, plaintiff contends, any potential purchaser of the fleet who was familiar with the container leasing industry and the military contract would not have bid as high a price for the Partnerships' fleets, and the Proxy Statements' failure to disclose "the [e]ffect of these factors on the bids for the Partnerships rendered the Proxy Statements false or misleading." (See id. ¶ 91.)

Plaintiff asserts federal claims for violation of §§ 14(a) and 20(a) of the Securities

---

[2] According to plaintiff, Textainer Equipment, in 2006, "paid a significant sum for the right to manage another fleet." (See id.)

[3] Plaintiff does not allege the specific Textainer entity that entered into the military contract.

4

1  Exchange Act of 1934 ("Exchange Act"), and state law claims for breach of fiduciary duty
2  and aiding and abetting such breach.  (See id. ¶¶ 117-137.)  The instant putative class
3  action is asserted on behalf of "all persons who were limited partners of the Textainer
4  Partnerships on the date the Proxy Statements were filed with the SEC and disseminated
5  to the Limited Partners."  (See id. ¶ 110.)

## LEGAL STANDARD

7  A motion to dismiss under Rule 12(b)(6) cannot be granted unless "it appears
8  beyond doubt that the plaintiff can prove no set of facts in support of his claim which would
9  entitle him to relief."  See Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Dismissal can be
10 based on the lack of a cognizable legal theory or the absence of sufficient facts alleged
11 under a cognizable legal theory.  See Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699
12 (9th Cir. 1990).

13 Generally, a district court, in ruling on a Rule 12(b)(6) motion, may not consider any
14 material beyond the pleadings.  See Hal Roach Studios, Inc. v. Richard Feiner And Co.,
15 Inc., 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990).  Material that is properly submitted as part
16 of the complaint, however, may be considered.  See id.  Documents whose contents are
17 alleged in the complaint, and whose authenticity no party questions, but which are not
18 physically attached to the pleading, also may be considered.  See Branch v. Tunnell, 14
19 F.3d 449, 454 (9th Cir. 1994).  In addition, the Court may consider any document "the
20 authenticity of which is not contested, and upon which the plaintiff's complaint necessarily
21 relies," regardless of whether the document is referred to in the complaint.  See Parrino v.
22 FHP, Inc., 146 F.3d 699, 706 (9th Cir. 1998).  Finally, the Court may consider matters that
23 are subject to judicial notice.  See Mack v. South Bay Beer Distributors, Inc., 798 F.2d
24 1279, 1282 (9th Cir. 1986).  In analyzing a motion to dismiss, the Court must accept as true
25 all material allegations in the complaint, and construe them in the light most favorable to the
26 nonmoving party.  See NL Industries, Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).
27 The Court may disregard factual allegations if such allegations are contradicted by the facts
28 established by reference to exhibits attached to the complaint.  See Durning v. First Boston

Corp., 815 F.2d 1265, 1267 (9th Cir. 1987). Conclusory allegations, unsupported by the facts alleged, need not be accepted as true. See Holden v. Hagopian, 978 F.2d 1115, 1121 (9th Cir. 1992).

## DISCUSSION

### A. Section 14(a) Claim

The Court previously dismissed plaintiff's claim for violation of § 14(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder, as alleged in the Third Consolidated and Amended Class Action Complaint ("Third Amended Complaint"), with leave to amend. The Textainer Defendants again move to dismiss said claim, both for failure to state a claim and for failure to comply with the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA").[4]

Section 14(a) makes it unlawful for any person to solicit, in violation of regulations promulgated by the SEC, "any proxy or consent or authorization in respect of any security . . . registered pursuant to section 78l." See 15 U.S.C. § 78n(a). SEC Rule 14a-9 provides: "No solicitation subject to this regulation shall be made by means of any proxy statement . . . containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." See 17 C.F.R. § 240.14a-9(a). The United States Supreme Court has held that § 14(a) "was intended to promote the free exercise of the voting rights of stockholders by ensuring that proxies would be solicited with explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought." See TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 444 (1976) (internal quotations and citations omitted). Section 14(a) thus acts to "ensure disclosures by corporate management in order to enable

---

[4] The PSLRA sets forth a heightened pleading standard for claims based on misleading statements and omissions; the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." See 15 U.S.C. § 78u-4(b)(1).

6

the shareholders to make an informed choice." See id. at 448.

Plaintiff alleges that the following representations in the proxy statements were materially misleading in violation of § 14(a) and Rule 14a-9:

- Market conditions at historically high levels have increased the attractiveness of the container fleet to prospective buyers.
- Selling now avoids having to liquidate assets under time constraints and uncertain market conditions in future years due to expiration of normal lives of the Textainer Partnerships.
- Selling now eliminates the risk and uncertainty of possible future downturns in market conditions for leased and used containers.

(See 4AC ¶ 78; see also Textainer Defendants' Request for Judicial Notice ("RJN"), Ex. A (Proxy Statement) at 4.) Plaintiff further alleges that the following statement in the Maccarone letter was materially false and misleading in violation of § 14(a) and Rule 14a-9: "The Asset Sale will provide you with the opportunity to liquidate your investment in the Partnership[s] for cash at a price and on terms that the general partners believe are fair to and in the best interests of the limited partners of the Partnership[s]." (See 4AC ¶ 80; see also RJN, Ex. A (Maccarone Letter) at 2.)

Where, as here, the allegations of misleading statements are based on information and belief, the PSLRA requires that the complaint "state with particularity all facts on which that belief is formed." See 15 U.S.C. § 78u-4(b)(1). The Ninth Circuit has held the above-referenced section of the PLSRA requires the plaintiff to "provide, in great detail, all the relevant facts forming the basis for [that] belief" and to "provide a list of all relevant circumstances in great detail." See In re Silicon Graphics, Inc. Securities Litigation, 183 F.3d 970, 984, 985 (9th Cir. 1999). Additionally, the PSLRA requires that the complaint reveal the "sources of [the plaintiff's] information," "corroborating details," and facts demonstrating the reliability of the plaintiff's assertions. See id. at 985.

**1. Failure to Disclose Alleged Increase in Market Price**

**a. Prior Rulings**

The Court, in its prior orders, dismissed plaintiff's § 14(a) claim with leave to amend, to the extent such claim was based on the proxy statements' alleged failure to disclose that

the price of shipping containers had increased by 18-20% after the date the Textainer Defendants and RFH agreed on a price for the Asset Sale. (See Order Granting in Part and Denying in Part Textainer Defendants' Motion to Dismiss, filed December 12, 2005, ("First Dismissal Order") at 8-12; Order Granting in Part and Denying in Part Textainer Defendants' Motion to Dismiss, filed May 15, 2006, ("Second Dismissal Order") at 6-9; Order Granting in Part and Denying in Part Textainer Defendants' Motion to Dismiss, filed August 10, 2006, ("Third Dismissal Order") at 6-9.) In the First Dismissal Order, the Court found that, in light of the proxy statements' disclosure that there were significant increases in container prices in 2004, plaintiff's complaint failed to articulate with the requisite particularity why the challenged representations in the proxy statements were materially misleading as opposed to merely incomplete. (See First Dismissal Order at 9 (citing Brody v. Transitional Hospitals Corp., 280 F.3d 997, 1006 (9th Cir. 2002).) In particular, the Court noted that plaintiff had failed to allege with the requisite particularity (1) that market prices for containers were not readily available to the public; (2) the source of plaintiff's information as to an 18-20% increase in the price of containers during the relevant time period; and (3) that the alleged price increase applied to the particular type of containers owned by the Textainer Partnerships. (See First Dismissal Order at 10-11.)

In the Second Dismissal Order, the Court found plaintiff had adequately amended his complaint to allege the prices of shipping containers are not readily available to the public, but that plaintiff's allegations as to the asserted 18-20% price increase remained too conclusory to satisfy the PSLRA's heightened pleading standard.[5] (See Second Dismissal Order at 7-8.) In particular, the Court found "[p]laintiff's conclusory allegations as to an unspecified analysis performed by an unnamed or otherwise identified consultant, and which fail to include any information about the consultant's qualifications, how the analysis was performed, or the data upon which the consultant relied, are inadequate under the

---

[5] In light of plaintiff's failure to adequately plead the assertedly undisclosed 18-20% increase, the Court did not reach defendant's arguments as to the adequacy of plaintiff's amended allegations with respect to whether such price increase applies to the particular type of containers owned by the Textainer Partnerships. (See id.)

8

1 PLSRA's heightened pleading standard." (See id. at 8.)

2 In the Third Dismissal Order, the Court found that although plaintiff had amended the complaint to allege the name of their consultant, Manalytics International ("Manalytics"), and the consultant's qualifications, "the complaint is still inadequately pleaded because plaintiff fails to allege the factual content of any of the sources of information upon which Manalytics purportedly relied or to explain the analysis it assertedly performed." (See Third Dismissal Order at 8.) The Court further found that, even assuming plaintiff had adequately pleaded the asserted price increase, it had not adequately pleaded that such price increase applied to the Textainer Partnerships' fleet of used containers and used containers encumbered by leases, because "the complaint contains no summary or estimate of used container prices, no calculation comparing used container prices to new container prices, or any other corroborating information supporting Manalytics' claim of a strong correlation between new and used container prices." (See id. at 9.)

### b. Basis for Allegation as to 18-20% Price Increase

The Court finds plaintiff, in the instant pleading, has adequately alleged the factual basis for his contention that prices of new containers increased 18-20% in the second half of 2004. Plaintiff alleges that, according to a trade publication, Containerisation International, the average price of new 20 foot containers in 2004 increased from $1900 in the second quarter to $2050 in the fourth quarter, that Maccarone was quoted in the Journal of Commerce as stating that prices in 2004 reached as high as $2200, and that, according to Containerisation International and World Cargo News, prices continued to rise through the first quarter of 2005, with an average price of $2200 in the first quarter of 2005, and quotes of $2275 to $2320 in April 2005. (See id. ¶¶ 3, 41.) According to plaintiff, Manalytics concluded, based on an analysis which included, inter alia, a review of industry literature, including back issues of Containerisation International, Journal of Commerce, and World Cargo News, that new container prices increased by approximately 18 to 20% from July 2004 to January 2005. (See id. ¶¶ 45, 53.) Assuming an average price of $1900 on July 1, 2004, an 18 to 20% increase would result in a January 2005 price of

9

approximately $2242 to $2280, which, although higher than the $2200 figure quoted in Containerisation International, (see id. ¶ 41), is in the ballpark of the figures reported by industry publications.

Accordingly, the Court finds plaintiff has now adequately alleged the existence of a significant increase in the price of new containers during the second half of 2004.

### c. Application of Alleged Price Increase to Particular Type of Containers Owned by Textainer Partnerships

Defendants contend plaintiff nonetheless has failed to allege with the requisite particularity that the prices for used containers and used containers encumbered by leases, such as those sold by the Textainer Defendants, rose by a similar amount during the same period.

Although plaintiff continues to allege that Manalytics' databases contain data on new and used container prices, (see id. ¶ 41), plaintiff has not amended the complaint to allege a summary or estimate of used container prices during the relevant periods, or any calculations comparing used container prices to new container prices. Rather, plaintiff alleges the mere conclusion that "[b]ased on its industry expertise and knowledge of the market environment during [the relevant] time period, Manalytics indicated that the value of an active fleet would increase by a similar proportion to the newbuild prices due to increased lease rates and other demand factors such as high container utilization, reduced buying by shipping lines due to increasing prices, and increasing secondary market prices (influenced by new equipment prices with a 60-90 day lag time)." (See id. ¶ 53.) Such a conclusory allegation fails to comply with the Ninth Circuit's admonition that the PLSRA requires a plaintiff to "provide, in great detail, all the relevant facts forming the basis for [the] belief" that a statement is misleading, and to "provide a list of all relevant circumstances in great detail." See Silicon Graphics, 183 F.3d at 984, 985. Moreover, the issue in the instant action is not whether prices for new and used containers ordinarily "would" increase at the same rate, but whether they actually did so during the relevant time period. The Court has repeatedly informed plaintiff that he must allege the factual content

of the information on which Manalytics relied.  (<u>See</u> Third Dismissal Order at 8; Second Dismissal Order at 8-9.)  That plaintiff contends Manalytics has data on sale prices for used containers, (<u>see</u> 4AC ¶ 48), but has repeatedly failed to allege any such figures for the relevant time period or, indeed, for any other time period, suggests that plaintiff cannot do so.

Plaintiff further alleges, citing a 1996 report of the United States General Accounting Office, that even as early as 1996, most cargo was shipped in standardized shipping containers.  (<u>See</u> <u>id</u>. ¶ 55.)  Plaintiff alleges that 95% of the containers used in international shipping are one of three standard sizes of containers, and that, consequently, containers have become "fungible" items.  (<u>See</u> <u>id</u>. ¶ 61.)  The Textainer Partnerships' fleet, plaintiff contends, consists entirely of standard sized containers.  (<u>See</u> <u>id</u>.)  According to plaintiff, customers are not concerned with whether their "goods were shipped in a new container or a container that was three, five, or ten years old because the desired end result – to get the cargo from one location to another – is just as ably accomplished by an older container as it is by a new container."  (<u>See</u> <u>id</u>. ¶ 64.)  Although such allegations may give rise to an inference that new and used containers are interchangeable from a shipping customers' perspective, they do not give rise to an inference that they are interchangeable from a purchaser's perspective, or that when the price of new containers rises, the price of used containers rises by the same percentage.

Additionally, according to plaintiff, Maccarone was quoted in the May 7, 2004 issue of the <u>New Jersey Record</u> as stating that "[a]lthough it costs [Textainer] more to buy containers, demand has pushed up the cost of leasing a container."  (<u>See</u> <u>id</u>. ¶ 4.)  Plaintiff also now alleges that the <u>Drewry Report</u>, an industry publication, states that "[c]ontainer lease rates have an almost direct correlation with newbuild prices."  (<u>See</u> <u>id</u>. ¶ 44.)  Although these statements provide support for the unremarkable contention that leasing rates for new containers rise when the cost of buying new containers rises, it provides no support for plaintiff's contention that when the price of new containers rises, the price of used containers or used containers that have already been leased rises by the same

amount.

Plaintiff also now alleges that the August 2004 issue of World Cargo News noted that "[t]he rise in new container prices had brought another benefit for lessors in that the value of existing equipment assets has been upwardly revised." (See id. ¶ 44.) Although this statement suggests that the price of new containers has an effect on the value of used containers, it provides no support for plaintiff's contention that the prices of new and used containers rise by the same amount.

With respect to used containers encumbered by leases, plaintiff alleges Textainer is one of the six largest container leasing companies, which collectively account for approximately 78% of the container market, and that each company has similar fleets, similar customers, operates in similar areas, and operates in a similar manner with respect to the leasing of containers. (See id. ¶ 57.) Plaintiff further alleges that, in Manalytics' opinion, an increase in container prices would affect all of the leasing companies in a similar manner; the value of the containers in their fleets would rise, and the existence or absence of long-term leases for the containers in their fleets is immaterial. (See id. ¶ 59.) Plaintiff also alleges that Textainer had an unspecified "lower percentage" of its fleet subject to long-term leases than other top leasing companies, and that long-term leases are typically shorter than they used to be, and now are typically for a period of three to five years. (See id. ¶ 60.) These allegations fail to support a contention that the price of used containers encumbered by leases would increase in lockstep with the price of new containers, however. There is no allegation in the complaint, for example, that leases in the container industry typically contain provisions allowing lease rates to be increased during the term of the lease if the price of new containers rises. As with the Third Amended Complaint, the instant § 14(a) claim, as alleged in the Fourth Amended Complaint, "is still inadequately pleaded because plaintiff fails to allege the factual content of any of the sources of information upon which Manalytics purportedly relied or to explain the analysis it assertedly performed." (See Third Dismissal Order at 8.)

Accordingly, the Court finds plaintiff has not adequately pleaded that the asserted 18

to 20% increase in new container prices also applied to the price of the used containers and used containers encumbered by leases sold by the Textainer Partnerships.

### d. Conclusion

For the reasons set forth above, defendants are entitled to dismissal of plaintiff's § 14(a) claim to the extent such claim is based on the allegation that the Textainer Defendants failed to inform the limited partners, in the proxy statements, that the market price of the containers being sold to RFH rose significantly in the second half of 2004.

### 2. Failure to Disclose Sale Price Was Lower Due to Management Contract Requirement

#### a. Prior Rulings

In the First Dismissal Order, the Court dismissed plaintiff's § 14(a) claim with leave to amend, to the extent such claim was based on the allegation that the Textainer Defendants failed to inform the limited partners, in the proxy statements, that the sale price was adversely affected by the management contract requirement. (See First Dismissal Order at 12-14.) The Court noted that the proxy statements disclosed not only that acceptance of a management contract with Textainer Equipment was one of the conditions for bidding as well as a condition of the Asset Sale Agreement, but also disclosed the principal terms of that management contract. (See First Dismissal Order at 12-13.) The Court found plaintiff had not adequately alleged the reason(s) why such disclosure was materially misleading, as, based on the information disclosed in the proxy statement, any Textainer limited partner could infer that the management contract requirement might have affected the ultimate bid price. (See id. at 13.)

In the Second Dismissal Order, the Court again dismissed said claim. Although plaintiff had amended the complaint to allege a failure by the Textainer Defendants to disclose in the proxy statements that they had excluded from the bidding process all container leasing companies, which, plaintiff further alleged, were likely to pay the highest price due to their ability to take advantage of economies of scale, the Court found the Second Amended Complaint contained no allegation suggesting that any container leasing

1  company would have bid more than RFH, such as an allegation that a comparable asset
2  sale in which container leasing companies were permitted to bid generated a higher price
3  than RFH's bid in the instant case. (See Second Dismissal Order at 10.)

4  In the Third Dismissal Order, the Court again dismissed the above-referenced claim,
5  holding plaintiff "still fail[ed] to allege any facts suggesting that any container leasing
6  company would have bid more than RFH's bid in the instant sale," such as facts
7  suggesting, for example, "that RFH's bid was below market price at the time it was made,
8  or that a comparable asset sale in which container leasing companies were permitted to bid
9  generated a higher price than RFH's bid." (See Third Dismissal Order at 11.)

### b. Current allegations

11  As defendants correctly note, plaintiff has not amended the complaint to allege any
12  additional facts about the assertedly excluded bidders. Plaintiff has not identified any
13  leasing company that was excluded from the bidding, pleaded what price any excluded
14  bidder might have been willing to pay, or otherwise pleaded any facts suggesting that a
15  container leasing company excluded from bidding would have bid more than RFH's high
16  bid.

17  Additionally, plaintiff has not amended the complaint to allege facts comparing the
18  price RFH paid for the Textainer Partnerships' fleet to prices obtained in other comparable
19  asset sales. Nor has plaintiff attempted to compare, for example, the price paid by RFH to
20  the average price for used containers during the relevant time period. Although plaintiff
21  now concedes he "does not contend that RFH's bid was below market value at the time it
22  was made," he reiterates his contention that "the bids received reflected a reduced amount
23  because of" the management contract requirement. (See Opp. at 14 n. 5.) Plaintiff further
24  adds new allegations that the Proxy Statements' failure to discuss the military contract
25  made the Proxy Statements misleading because the existence of the military contract,
26  coupled with the management contract requirement, would have reduced the amount bid

for the Textainer Partnerships' fleet.[6] (See 4AC ¶ 91.) Plaintiff also now contends that Textainer Equipment has paid at least one third party for the right to manage the third party's fleet, and that, consequently, bidders for the Textainer Partnerships' fleet would have discounted their bids to account for the management contract requirement. (See id. ¶ 6.) Even if one were to assume, arguendo, that some bids were reduced because of the existence of the management contract, the military contract, and the value of the right to manage the fleet, however, plaintiff cannot have suffered damages as a result thereof. Plaintiff cannot concede that the amount RFH paid for the fleet was not below market value at the time the sale was entered into, and at the same time claim that the sale price was adversely affected by the management contract requirement.

Accordingly, defendants are entitled to dismissal of plaintiff's § 14(a) claim to the extent such claim is based on the allegation that the Textainer Defendants failed to inform the limited partners, in the proxy statements, that the sale price was adversely affected by the management contract requirement.[7]

### 3. Statement in Maccarone Letter as to Fairness of Asset Sale

#### a. Prior Rulings

In the First Dismissal Order, the Court dismissed, with leave to amend, plaintiff's § 14(a) claim, to the extent such claim is based on allegations that the Maccarone Letter was materially false or misleading in that the Asset Sale was priced below prevailing market value and therefore was not in the best interests of the limited partners. (See First Dismissal Order at 14-15.) The Court noted that such statement is an opinion, and that a defendant may be liable for statements of opinion only if (1) the speaker did not actually

---

[6] In essence, plaintiff appears to contend that any potential bidder who was aware of the military contract would have reduced its bid to take into account the possibility that Textainer Equipment would embezzle the containers from their new owner and use them to fulfill Textainer's obligations under the military contract.

[7] In light of the Court's finding that plaintiff has not adequately pleaded the Proxy Statements were materially misleading, the Court does not reach defendants' additional argument that plaintiff has not pleaded with the requisite particularity that Textainer was negligent in "not disclosing either the alleged increase in container prices or the supposed price impact of its management contract." (See Motion at 12.)

15

hold the opinion and (2) the opinion was objectively false or misleading. (See id. at 15 (citing In re AOL Time Warner, Inc. Securities and "ERISA" Litigation, 381 F. Supp. 2d 192, 243 (S.D.N.Y. 2004); In re Reliance Securities Litigation, 135 F. Supp. 2d 480, 515 (D. Del. 2001); In re McKesson HBOC, Inc. Securities Litigation, 126 F. Supp. 2d 1248, 1265 (N.D. Cal. 2000)).). The Court dismissed the claim because plaintiff failed to allege that the Textainer Defendants did not actually hold the opinion stated in the Maccarone Letter, and because plaintiff had failed to adequately allege objective falsity. (See First Dismissal Order at 15.)

In the Second Dismissal Order, the Court again dismissed said claim because plaintiff had not alleged with the requisite particularity that there actually were significant increases in the price of the relevant containers in the second half of 2004, or that the management contract requirement or the decision to exclude container leasing companies from the bidding adversely affected the price obtained in the Asset Sale. (See Second Dismissal Order at 12.) In the Third Dismissal Order, the Court again dismissed the above-referenced claim, finding the pleading was still deficient in that respect. (See Third Dismissal Order at 12.)

### b. Current Allegations

As discussed, plaintiff has not adequately alleged that the market price of the containers sold to RFH rose significantly during the second half of 2004. Plaintiff thus has not adequately alleged the opinion that the Asset Sale was "fair to and in the best interests of the limited partners," (see 4AC ¶ 80), was objectively misleading.

Moreover, as defendants point out, even assuming, arguendo, plaintiff has alleged the opinion set forth in the Maccarone letter was false and misleading, plaintiff's § 14(a) claim, to the extent such claim is based on the Maccarone letter, still fails to state a claim, because plaintiff has not alleged any facts suggesting that the Textainer Defendants did not actually hold the opinion that the Asset Sale was "fair to and in the best interests of the limited partners." (See 4AC ¶ 80.) As noted, a defendant may be liable under § 14(a) for statements of opinion only if (1) the speaker did not actually hold the opinion and (2) the

16

opinion was objectively false or misleading.  (See First Dismissal Order at 15 (citations omitted)).  As defendants correctly note, plaintiff has not even alleged that the Maccarone opinion was not subjectively believed by the Textainer Defendants at the time it was offered, much less alleged the existence of "contemporaneous documents, witness accounts, or contradictory statements to show" that the Textainer Defendants subjectively believed the sale price was unfair to investors.

As plaintiff has had numerous opportunities to so amend the Complaint, and has failed to do so, defendants are entitled to dismissal of plaintiff's § 14(a) claim to the extent such claim is based on the allegation that the opinion set forth in the Maccarone Letter, that the Asset Sale was fair to and in the best interests of the limited partners, was false and misleading.

### 4. Conclusion

For the reasons set forth above, defendants are entitled to dismissal of the § 14(a) claim in its entirety.  Plaintiff has had four opportunities to draft his complaint, and the Court has dismissed the § 14(a) claim on three prior occasions.  Plaintiff has repeatedly failed to successfully amend his § 14(a) claim to address the deficiencies identified by the Court.  The Court recognizes the Ninth Circuit has held that leave to amend should be granted with "extreme liberality."  See Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1051 (9th Cir. 2003).  In determining whether to grant leave to amend, the Court may, however, consider factors such as repeated failure to cure deficiencies by previous amendments.  See id. at 1052 (citing Foman v. Davis, 371 U.S. 178, 182 (1962)); see also In re Read Rite Corp. Securities Litigation, 335 F.3d 843, 845 (9th Cir. 2003) ("The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint.").

Here, despite repeated opportunities to do so, plaintiff has failed to amend his complaint to state a § 14(a) claim.

Accordingly, defendants are entitled to dismissal of plaintiff's § 14(a) claim.

### B. Section 20 Claim

Plaintiff alleges the Textainer Defendants are additionally liable for violating § 20(a) of the Exchange Act. (See SAC ¶¶ 111-113.) Section 20(a) provides that "every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." See 15 U.S.C. § 78t(a). "In order to prove a prima facie case under § 20(a), a plaintiff must prove: (1) a primary violation of federal securities laws . . . and (2) that the defendant exercised actual power or control over the primary violator." Howard v. Everex Systems, Inc., 228 F.3d 1057, 1065 (9th Cir. 2000). Because, as discussed above, plaintiff has failed to allege "an actionable independent underlying violation of the [Exchange] Act," plaintiff has not stated a claim for violation of § 20(a). See In re VeriFone Securities Litigation, 11 F.3d 865, 872 (9th Cir. 1993).

Accordingly, defendants are entitled to dismissal of plaintiff's § 20(a) claim.

### C. State Law Claims

The Textainer Defendants ask the Court to decline to exercise supplemental jurisdiction over the state law claims if the Court dismisses the federal claims.

Where the district's court jurisdiction is based on a federal question, the district court may decline to exercise supplemental jurisdiction over state law claims if it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine -- judicial economy, convenience, fairness, and comity -- will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 n.7 (1988).

Here, the Court finds no reason to retain supplemental jurisdiction over plaintiff's state law claims, particularly since essentially the same state law claims are being litigated against the Textainer defendants in a separate class action in state court. (See Request for Judicial Notice Ex. B.) The fact that RFH is not a defendant to the state court action

does not support retention of jurisdiction, as plaintiff has the option of refiling his claims against RFH in state court.  Additionally, although plaintiff expresses concerns that Alan Gordon ("Gordon") became a named plaintiff in the state court action after withdrawing as a candidate for lead plaintiff in the instant action, this Court made no finding that Gordon was an inadequate candidate, and plaintiff concedes that Gordon was appointed as a class representative in the state court action, thus apparently satisfying any concerns of the state court.

Accordingly, as the Court has dismissed plaintiff's federal claims, the Court declines to assume supplemental jurisdiction over the remaining state law causes of action.  The Court will dismiss the state law causes of action without prejudice to plaintiff's refiling those claims in state court.

**CONCLUSION**

For the reasons set forth above, the Textainer Defendants' motion to dismiss is hereby GRANTED in its entirety.  Plaintiffs' § 14(a) and § 20(a) claims are hereby DISMISSED.  Plaintiff's state law claims are hereby DISMISSED without prejudice to plaintiff's refiling said claims in state court.

**IT IS SO ORDERED.**

Dated: January 10, 2007

_____
MAXINE M. CHESNEY
United States District Judge